Thomas C. Newkirk (TN-7271)
Treazure R. Johnson (TJ-3001)
Leonard W. Wang
Linda Berrafati Moran
Daniel A. Weinstein
Asha A. Mathew
Jason E. Tankel
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
450 5th Street, N.W.
Washington, D.C.  20549
202-942-4523
202-942-9581 (FAX)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

  v.

**COMPLAINT**

VINCENT P. IANNAZZO and
MILTON E. STANSON,

      Defendants

---

The Plaintiff, the United States Securities and Exchange Commission (the "SEC"), for its Complaint against Defendants Milton E. Stanson and Vincent P. Iannazzo (collectively, the "Defendants"), alleges as follows:

## SUMMARY

1. From at least October 2000 through approximately April 2001, the Defendants engaged in a scheme to defraud and manipulate the public trading market for the stock

issued by Emex Corporation ("Emex").  The purpose of Defendants' scheme was to deceive the investing public as to the status of the energy technology being developed by Emex – an innovative gas-to-liquids ("GTL") technology – as well as the state of the company's financial prospects and value, thereby artificially increasing the value of the company's stock owned by the Defendants and the price at which the company could potentially sell stock to new investors.  An increase in the company's stock price would correspondingly increase Emex's ability to raise capital and also permit the release of shares owned by the Defendants that they had pledged as collateral for loans associated with Emex.  The Defendants carried out this scheme by, among other things, making and causing Emex to make materially false and/or misleading statements in press releases issued during the relevant period as well as in Emex's year 2000 Annual Report.  The Defendants further omitted, and caused Emex to omit, material information from such public statements.  These misrepresentations and omissions caused Emex's stock price to increase dramatically until certain of the Defendants' wrongful activities were discovered.  At that point Emex's stock's value dropped precipitously.

2. Ultimately, despite the Defendants' and Emex's claims, the company's GTL technology was never shown to be commercially viable and, to date, has not been commercially exploited in any manner.  Rather, on December 31, 2002, Emex filed for Chapter 7 bankruptcy and all of its assets currently are in the process of liquidation.

3. As a result of the foregoing conduct, and as described in greater detail below, the Defendants directly or indirectly have engaged in transactions, acts, practices and courses of business which constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5]. In addition, the Defendants, directly or indirectly, have aided and abetted Emex's violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1].

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action pursuant to Sections 21(d)(3), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e) and 78aa].

5. Venue properly lies in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain acts or transactions constituting the violations occurred within this District.

6. In connection with the transactions, acts, practices, and courses of business alleged herein, Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange.

7. Defendants, unless restrained and enjoined by this Court, will continue to engage in transactions, acts, practices, and courses of business as set forth in this Complaint or in similar illegal acts and practices. Thus, the Commission requests that the Court permanently enjoin Defendants from engaging in further violations of the securities laws, impose civil penalties upon them, and order them to pay disgorgement as well as prejudgment interest.

**DEFENDANTS**

8.  Vincent P. Iannazzo is an individual who resides in Alpine, New Jersey. Iannazzo was a part owner of Emex and was a Director of the company from August 2000 until April 2002. With his co-defendant Milton E. Stanson, he was responsible for the day-to-day operations of Emex.

9.  Milton E. Stanson is an individual who resides in New York, New York. Stanson was a part owner of Emex and was a Director, Vice President and Treasurer of the company from August 2000 until December 2002. Stanson formerly worked as a stockbroker at Gruntal & Co.

**FACTS**

**A.  Other Relevant Entities and Individuals**

10. Emex Corporation is a Nevada corporation with no established operating business. At all times relevant to this action, Emex was headquartered in New York City, and had two main subsidiaries, Blue Star Sustainable Technologies Corporation ("Blue Star") and North Star Exploration, Inc. ("North Star"). Blue Star, whose operations were located in Arvada, Colorado, claimed to be focused on developing innovative technologies for exploiting energy resources, in particular natural gas, while North Star claimed to be focused on mining gold and other metals and minerals. Emex's stock is registered with the Commission pursuant to section 12(g) of the Securities Exchange Act of 1934.

11. David H. Peipers is an individual who resides in New York, New York. He was a director of Emex from August 2000 at least through December 2002. During the time period at issue in this case, Peipers owned approximately 47.5% of Emex and was

primarily responsible for funding the company. Peipers was not involved in the daily operations of Emex.

12.     Nicholas Vanderborgh is an individual who resides in Colorado. He is a scientist with a specialty in energy technology and served as President of Blue Star from August 2000 at least through December 2002. Prior to joining Emex, for more than 20 years Vanderborgh worked at Los Alamos National Laboratory.

**B.     Background**

13.     Throughout the 1990's Stanson, Iannazzo and Peipers were mutually involved in numerous investments – ranging from gold mining to hybrid tree farming – none of which ultimately proved profitable. Throughout their various business arrangements their *modus operandi* was that Peipers and his family, primarily his grandmother, supplied the investment funds while Stanson and Iannazzo provided the so-called "sweat equity." The investment funds consisted primarily of bank loans secured by collateral posted by Peipers' grandmother. Indeed, by mid-2000, the Peipers family had provided collateral for approximately $26 million in bank loans for various of the parties' investments.

14.     In the late 1990's Iannazzo and Stanson decided to invest in GTL technology. The goal of this technology was to convert natural gas into diesel fuel as well as other marketable petroleum products using an ecologically clean process. To that end Stanson offered a job to Vanderborgh, who at the time was a scientist at Los Alamos National Laboratory, and an expert in the technology. By the fall of 1999 Vanderborgh was

5

working full-time for Blue Star with a small staff of scientists and engineers, all located in Arvada, Colorado.

15.     In early 1999, Stanson, Iannazzo and Peipers decided to acquire a public vehicle into which they could place the assets of, and thereby create liquidity for, certain of their investments.  To that end they identified and contacted Hawks Industries, Inc. ("Hawks"), which at the time was essentially a public "shell" corporation that traded on the Nasdaq SmallCap Market.

16.      Thereafter, on August 15, 2000 the parties closed a transaction wherein Peipers and his family on the one hand, and Stanson and Iannazzo on the other, each acquired approximately 47.5% of Hawks via a reverse merger.  The remaining 5% of Hawks would be publicly held.  Immediately after the closing the new owners merged Blue Star into Hawks.  In February 2001 Hawks's name was changed to Emex Corporation.

**C.     Stanson, Iannazzo and Peipers Pledge their Emex Shares**

17.     In the fall of 2000 Stanson, Iannazzo and Peipers took an additional $4 million bank loan to fund the cash portion of the Hawks purchase price.  While Peipers' grandmother again supplied the bank with collateral to secure that loan, due to the fact that the family had lost a considerable amount of money in other ventures with Stanson and Iannazzo she required the three partners also to pledge their Emex shares to the bank as additional security (the "Pledged Shares").

**18.**     In November 2000 Iannazzo and Peipers signed agreements pursuant to which Peipers would cause the bank to release Stanson and Iannazzo's half of the Pledged Shares when certain conditions were met (the "Pledge Release Agreements").  Copies of the Pledge Release Agreements are attached hereto as Exhibit "A".  In essence, the

6

Pledge Release Agreement provided that half of Stanson's and Iannazzo's shares would be released when the Pledged Shares' market value reached $250 million, and the remaining half would be released when the market value reached $500 million. Pursuant to amendments executed by Peipers and Iannazzo, the Pledge Release Agreements were scheduled to expire at the end of 2001. Thus, after that date there would be no mechanism for release of the shares other than repayment of the $4 million bank loan.

19.     Shortly after Stanson and Iannazzo were required by Peipers' family to pledge their Emex shares as security for bank loans, their relationship with Peipers began to deteriorate. Towards the end of 2000 the previously free-flowing stream of money from Peipers and his family was ending. Lacking that resource, the easiest way for Stanson and Iannazzo to obtain further investment funds was through hypothecation of their Emex shares, *i.e.*, by pledging their shares as collateral for additional loans.

20.     In fact, this is exactly what they attempted to do. During the spring of 2001 Stanson and Iannazzo actively sought deals wherein they could use their shares to obtain additional loans. However, as long as their shares remained pledged as security for the outstanding $4 million loan that funded in part the Hawks acquisition, there was no chance that any such deal would come to fruition. The shares could only be released through operation of the Pledge Release Agreements, which would require an increase in Emex's share price. Given the fact that Emex's GTL technology was still in the developmental stage, and the Pledge Release Agreements were due to expire at the end of 2001, there was little chance that release of the Pledged Shares pursuant to the Pledge Release Agreements would be triggered through natural growth of the company.

**D.    The Scheme To Manipulate**

21.    Although Vanderborgh and his staff spent considerable effort attempting to develop Emex's GTL technology, Emex never successfully demonstrated its technology at any commercially viable production level. Rather, in the spring of 2001, Emex slowly was working toward completion of a two barrel-per-day GTL demonstration plant. As of mid-2001 Emex's experimental plant had run only intermittently for approximately one month before it failed. A year later, in 2002, Emex was still trying to demonstrate its two barrel-per-day test plant. Thus, as late as the fall of 2002, long after the events at issue in this case, Emex's technology remained at the developmental stage.

22.    While Vanderborgh and his team were working toward building a two barrel-per-day experimental GTL plant, Stanson and Iannazzo were busy promoting Emex as an investment. Beginning in the fall of 2000 Stanson and Iannazzo sought to attract investors, and thus additional capital by implementing a plan to issue well-timed press releases touting Emex's purported accomplishments and future prospects. These announcements addressed not only the status of the development of Emex's technology but also its efforts to obtain financing for construction of a facility to commercially utilize the technology.

23.    Notwithstanding the fact that Emex had yet to successfully run its two barrel-per-day experimental plant, and thus did not have a product it could successfully market, in early 2001 Stanson and Iannazzo decided to seek financing to build a 2,500 barrel-per-day commercial GTL plant consisting of five 500 barrel-per-day modules. To this end,

Stanson asked an acquaintance of his at Credit Suisse First Boston ("CSFB") to assist Emex in raising money for its proposed GTL plant.

24. CSFB was neither interested in financing nor attempting to raise money for Emex. It did, however, provide Emex with a list of several small project finance firms, which might be interested in helping Emex, including Fieldstone, Inc ("Fieldstone").

25. On March 27, 2001 Emex representatives, including Stanson and Iannazzo, met with representatives from Fieldstone. During this meeting Emex's representatives falsely represented to Fieldstone that its GTL technology was commercially viable and that, but for the funds needed to build the proposed plant, the company was ready to produce diesel fuel, wax and/or various other petroleum products at a profit.

26. During the March 27, 2001 meeting Fieldstone advised the Emex representatives that before it could hope to raise any capital for Emex, Emex would have to satisfy various conditions. Specifically, not only would Emex need to provide Fieldstone with copies of various contracts for the proposed plant, but it would further need to obtain market studies related to the pricing of the plant's products and an independent consultant's report on future gas market prices. At the time of the Fieldstone meeting Emex had no contracts for the proposed plant and no market surveys. Indeed, Iannazzo knew, and Stanson either knew or was reckless in not knowing, that Emex was at least a year away from meeting the conditions set by Fieldstone.

27. Notwithstanding the fact that Emex would not be able to meet Fieldstone's conditions, on April 4, 2001 Emex and Fieldstone executed a financing agreement pursuant to which Fieldstone agreed to use its diligent and good faith efforts to attempt to raise up to $100 million in non-recourse project financing for Emex in exchange for a

non-refundable monthly retainer of $20,000 and a success fee payable in the event capital was raised (the "Fieldstone Agreement").  A copy of the Fieldstone agreement is attached hereto as Exhibit "B".  Ultimately, Emex neither satisfied the conditions necessary for Fieldstone to raise money for it nor sent Fieldstone any payments other than the first month's retainer.  Fieldstone, for its part, never attempted to arrange any financing for Emex.

                1.      <u>*Materially False or Misleading Press Releases In 2000*</u>

28.      Throughout the fall of 2000 Stanson and Iannazzo, who ran Emex's daily operations, were regularly informed by Vanderborgh via conversations, documents, and meetings that Emex's GTL technology still was in the developmental stage and was not yet commercially viable.

29.      Notwithstanding this fact, in late 2000, Emex issued at least two press releases (together, the "Fall 2000 Releases") in which it made false and misleading statements regarding its proprietary GTL technology.  The releases claimed, among other things, that Emex's technology was both superior to competing technologies and commercially viable.  These statements were materially false and/or misleading.

30.      Specifically, on October 20, 2000, Emex issued a press release titled *Hawks Industries Discusses Its Technology -- Makes Gas To Liquid Technology Economically Viable; One of the Most Efficient Gas Utilization Systems in the World*.  Subsequently, on November 15, 2000, Emex issued another press release titled *Hawks Industries Announces Revolutionary Advancement for Production of Clean Diesel Fuel* in which the company claimed that its technology would achieve substantial cost savings over standard GTL processes and that initial shipments to end users were anticipated for the

first quarter of 2001. Copies of each press release are attached hereto as Exhibits "C" and "D" respectively.

31. Stanson and Iannazzo drafted, reviewed and approved the Fall 2000 Releases prior to their publication and caused Emex to issue them.

2. *Materially False or Misleading Press Releases 2001*

32. Throughout the spring of 2001 Stanson and Iannazzo were regularly informed by Vanderborgh via conversations, documents, and meetings that Emex's GTL technology still was in the developmental stage and was not yet commercially viable. Furthermore, since they were responsible for the Emex's daily operations, Stanton and Iannozzo were of aware of the nature of the Fieldstone Agreement

33. Notwithstanding these facts, in early 2001 Emex issued three press releases, on April 3, April 9 and April 24 respectively, in which it again made materially false or misleading statements regarding its proprietary GTL technology as well as its financing agreement with Fieldstone (together, the "April 2001 Releases"). Copies of these press releases are attached hereto as Exhibits "E", "F" and "G" respectively. As was the case with the Fall 2000 Releases, the April 2001 releases claimed that Emex's technology was commercially viable. They further stated that Emex was poised to receive $100 million in funding to build a GTL plant utilizing that technology. These statements were materially false and/or misleading.

34. Specifically, on April 3, 2001, the day before the Fieldstone Agreement was executed, Emex issued a press release titled *Emex Corp. Plans to Build Natural Gas Synthesis Plant, Negotiating $100 Million Financing*. The text of the April 3 release stated that Emex's "technology's greatest strength is its versatility" and that it had

11

"developed the means to take natural gas and produce several revenue streams, which will put Emex on the map in a diverse array of markets…." Emex's claims, however, were materially false or misleading because, as Stanson and Iannazzo well knew, its technology was still in the developmental stages and Emex had no concrete revenue prospects and neither ready markets for nor contracts to sell its purported products. Furthermore, the Fieldstone Agreement was subject to contingencies that both Defendants knew, or were reckless in not knowing, could not be met in the near future.

35. On April 9, 2001, a few days after Emex signed the Fieldstone Agreement, the company issued a press release titled *Emex Corp. Accepts Proposal for Syndication of $100 Million in Project Financing to Build Commercial Unit*. The first two paragraphs of that release provided as follows:

> Emex Corp. (NASDAQ: EMEX) has accepted a proposal from a financial institution to arrange syndication of $100 million in project financing to build the first of a series of commercial plants utilizing the firm's proprietary gas technologies, which will produce clean-burning diesel fuel, high-quality waxes, electricity, thermal energy, specialty chemicals and water. The deal was arranged through the efforts of Credit Suisse First Boston, and is contingent on feasibility studies and due diligence.
>
> "This is a major milestone for the company. Our technology's potential has attracted significant capital, despite a relatively poor market environment," said Walter W. Tyler, EMEX CEO. "The time is right to develop a plant that can not only make clean burning fuels, specialty chemicals and industrial waxes, but can also generate surplus electricity, heat and water."

36. The April 9, 2001 press release was materially false or misleading. First, although the text of the release implied that Emex's GTL technology was commercially

viable in fact, as noted above, the company's technology only was at the developmental stage and never had been demonstrated to be viable on any commercial scale. Second, Emex misrepresented the nature of its financing agreement by implying that a $100 million financing already had been obtained when, in fact, Fieldstone had not yet even attempted to raise any money for the company, and there was little chance that any money would in fact be raised under the agreement. Finally, the April 9 release was misleading because it did not mention Fieldstone by name as the financial institution from which Emex accepted its financing proposal. Rather, it was purposefully worded in a fashion that would lead an objective reader to think that CSFB, a much larger and well-known financier, was the financial institution from which Emex accepted the proposal.

37.     On April 24, 2001 Emex issued a press release titled *"Emex Corp. Hosts Scientific Community at Gas Synthesis Plant; Facility Tour Is Offshoot of DOE International Energy Conference in Boulder"*. That press release repeated the earlier misrepresentations regarding the status of its GTL technology, *i.e.* that it was commercially viable, and the significance of its financing agreement with Fieldstone, *i.e.* that it had accepted a $100 million financing syndication proposal for plant construction. The release falsely implied that Emex was ready to build a commercial plant when in fact the company lacked both the technology and money required to complete such a project

38.     Stanson and Iannazzo drafted, reviewed and approved the April 2001 Releases prior to publication and caused Emex to issue those releases.

      *3.*  *Materially False or Misleading Year 2000 Annual Report*

39.     Emex's year 2000 Form 10-KSB filed with the Commission on April 17, 2001 reiterated the materially false or misleading representations made in Emex's April 2001

13

Releases. Specifically, Emex's Form 10-KSB falsely implied that Emex had a commercially viable technology, and that the company either had or imminently would have sufficient funds to build a commercial plant utilizing that technology. A copy of Emex's Annual Report is attached hereto as Exhibit "H".

**E.     The Scheme Comes Undone**

40.     Prior to March 28, 2001 Emex shares generally traded at approximately $5 per share and had never closed above $9 per share. As a result of the false and misleading public announcements, on April 10, 2001, the stock closed at $11 and on May 22, 2001 it closed at $29.26 – an increase of 166%.

41.     On April 17, 2001, within a week of their scheme having successfully raised the price of Emex's shares to $11.00, the trigger price for the release of half of their Pledged Shares under the Pledge Release Agreements, Stanson and Iannazzo sent Peipers a letter asserting that the conditions for release of half of their Pledged Shares had been satisfied and requesting that Peipers cause those shares to be released. A copy of that letter is attached hereto as Exhibit "I".

42.     On May 23, 2001 Dow Jones published an article titled *In the Money: CSFB Denies Lending Link with EMEX*. A copy of the article is attached hereto as Exhibit "J". The article noted that Emex's stock had "skyrocketed more than 180% since the company announced in early April that it accepted a $100 million project financing proposal that, according to the announcement, appeared to have been arranged by Credit Suisse First Boston." The story went on to state that CSFB had denied that it had signed any such deal with Emex and then questioned whether Emex had in fact raised any capital.

14

43.     Trading in Emex stock was halted the day the Dow Jones story was published. When trading re-opened on May 30, 2001, Emex's stock price closed at $16.98, a drop of 42% from its closing price on May 22, 2001.  By the first week of June 2001 the stock price had dropped into the single digits, and from there continued to slide.  Emex filed for Chapter 7 bankruptcy on December 31, 2002, and as of the date of this Complaint its stock price, currently quoted on the Pink Sheets, is under $.05 with little or no volume.

## FIRST CLAIM

### (Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5])

44.     Paragraphs 1 through 43 above are realleged and incorporated by reference herein.

45.     As set forth more fully above, Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or by the use of the mails and of the facilities of a national securities exchange, knowingly and recklessly, in connection with the purchase or sale of securities, have: a) employed devices, schemes, or artifices to defraud; b) have made untrue statements of material facts or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and c) have engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

46.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

## SECOND CLAIM

**(Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5])**

47. Paragraphs 1 through 46 above are realleged and incorporated by reference herein.

48. By engaging in the conduct described above, Defendants knowingly and substantially aided and abetted Emex's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## THIRD CLAIM

**(Aiding & Abetting Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1])**

49. Paragraphs 1 through 48 above are realleged and incorporated by reference herein.

50. By engaging in the conduct described above, Defendants knowingly and substantially caused Emex to file with the SEC a false and misleading annual report on Form 10-KSB.

51. By reason of the foregoing, Defendants aided and abetted Emex's violations of Section 13(a) of the Exchange Act, and Rules 12b-20 and 13a-1 thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter an Order:

A. Permanently enjoining Defendants from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as from aiding and abetting future violations of Section 10(b) of the Exchange Act and Rule 10b-5;

B.  Permanently enjoining Defendants from aiding and abetting future violations of Sections 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder;

C.  Directing Defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.  Pursuant to Section 21(d)(2) [15 U.S.C. § 78u(d)(2)] of the Exchange Act barring Defendants from serving as officers or directors of any public company;

E.  Requiring Defendants to disgorge any profits and gains realized as a result of their illegal conduct, with prejudgment interest; and

F.  Granting such further relief as this Court may deem just and appropriate.

Dated: April ___, 2004

    Washington, D.C.

SECURITIES AND EXCHANGE COMMISSION,

By its Counsel

_____
Thomas C. Newkirk (TN-7271)

_____
Treazure R. Johnson (TJ-3001)
Leonard W. Wang
Linda Berrafati Moran
Daniel A. Weinstein
Asha A. Mathew
Jason E. Tankel
 SECURITIES AND EXCHANGE COMMISSION
450 5th Street, N.W.
Washington, DC 20549-0911
Phone: (202) 942-4523 (Johnson)
 Fax:    (202) 942-9581(Johnson)

Case 1:04-cv-02989-MBM   Document 1   Filed 04/19/04   Page 18 of 18